## IN THE UNITED STATES DISTRICT COURT FOR THE
### EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

FILED
IN OPEN COURT

JAN 1 5 2026

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 1:26-cr-7 |
| | |
| | Counts 1, 2: 18 U.S.C. § 371 (Conspiracy) |
| v. | |
| | Count 3: 41 US.C. § 8702(2) (Unlawful Kickbacks) |
| LESLIE KACIBAN, JR. | |
| *Also known as Les Kaciban* | Count 4: 29 U.S.C. § 186 (Unlawful Labor Payments) |
| *Defendant.* | |
| | Forfeiture Notice |

## INDICTMENT

The Grand Jury Charges That:

### GENERAL ALLEGATIONS

#### A. Background

At all times relevant to the information, unless otherwise stated:

1.    Defendant LESLIE KACIBAN, JR. ("LESLIE KACIBAN") was the president of Company-1, which was a government prime contractor and subcontractor. As president of Company-1, Defendant LESLIE KACIBAN was a person who acted in the interest of an employer, that is, Company-1. Defendant LESLIE KACIBAN was also known as Les Kaciban. Defendant LESLIE Kaciban resided in the Eastern District of Virginia.

2.    Defendant LESLIE KACIBAN, Individual-2, Individual-3, and Individual-4 were related to one another.

3.    Company-1 was an Alabama corporation, headquartered in Herndon, Virginia, within the Eastern District of Virginia, engaged in the business of providing protective security officers at federal workplaces. Company-1 was an employer in an industry affecting interstate and

foreign commerce, that is the private security industry, within the meaning of Sections 142, 152, 186, and 402 of Title 29, United States Code.

4.    Defendant LESLIE KACIBAN, Robert Rubin, Individual-3, Individual-4, and Individual-6 all worked as fulltime employees of Company-1. Defendant LESLIE KACIBAN, Robert Rubin, and Individual-6 held managerial positions within Company-1.

5.    The International Union, Security, Police and Fire Professionals of America (SPFPA), was a labor organization based in Roseville, Michigan that represented private security officers at federal workplaces. SPFPA was a labor organization representing employees working in an industry affecting commerce, that is, the security industry, who participated through their local unions and other subordinate bodies of SPFPA. SPFPA existed for the purpose of dealing with employers concerning security industry employees' hours, wages and working conditions.

6.    Pursuant to its representation of security industry employees, SPFPA negotiated and executed collective bargaining agreements with employers in several states.

7.    SPFPA was a "labor organization" engaged in industries and activities affecting commerce within the meaning of the Labor Management Relations Act (LMRA), Title 29, United States Code, Sections 142, 152, and 186.

8.    Beginning in February 2021 and until approximately November 2024, Ricky O'Quinn served as vice-president at large in SPFPA, its second highest position. Before that, Ricky O'Quinn served as vice-president of Region 2 of SPFPA which covered several states in the central and southern United States. In both of those roles, Ricky O'Quinn served as an officer and employee of SPFPA within the meaning of 29 U.S.C. §§ 186(b) and 432(a).

2

9.      Company-2, Company-3, and Company-4 all performed worked on government contracts, either as prime or subcontractors. Company-2, Company-3, and Company-4 often partnered with Company-1 to fulfill or attempt to fulfill government contracts.

**B.  Company-2**

10.      Company-2 was a Florida corporation engaged in the business of providing protective security officers at federal workplaces and was an employer in an industry affecting interstate and foreign commerce within the meaning of 29 U.S.C. §§ 142, 152, 186, and 402.

11.      Mabel O'Quinn, the wife of Ricky O'Quinn, was Company-2's founder, owner, and an initial director.  From its incorporation in 2010 to the present, Mabel O'Quinn served as Company-2's chief executive officer and president.  Ricky O'Quinn participated in the finance, budget, and operations of Company-2 since its inception.

12.      Company-2 performed work on government contracts, either as a prime contractor or subcontractor.  Company-2 often partnered with Company-1 in fulfilling government contracts. Company-2 relied on, among other things, Company-1's size and reputation to win contracts.

13.      SPFPA represented, sought to represent, and would admit to membership the employees of Company-1 and Company-2.

14.      MCKHU, Inc. (MCKHU) was a consulting company incorporated in Ohio. Defendant LESLIE KACIBAN, Individual-2, and another member of the Kaciban family were MCKHU's incorporating members. MCKHU received payments for Defendant LESLIE KACIBAN and his family members from Company-2 and Company-3. From 2015 through 2018, Individual-3 and Individual-4 were full-time employees of Company-1 while simultaneously working as consultants for Company-2 through MCKHU.

3

15.     Frontline Source was another consulting company that was incorporated by Defendant KACIBAN's family members, Individual-3 and Individual-4. Frontline Source received payments for Defendant LESLIE KACIBAN and his family members from Company-2. In 2019 and 2020, Individual-3 and Individual-4 were full-time employees of Company-1 while simultaneously working as consultants for Company-2 through Frontline Source.

16.     In 2005, Ricky O'Quinn and Mabel O'Quinn formed the O'Quinn Family Trust. The beneficiaries of the O'Quinn Family Trust were Ricky O'Quinn, Mabel O'Quinn, and their children. From in or about September 2015 through in or about February 2024, Mabel O'Quinn transferred approximately $1,926,195 to the O'Quinn Family Trust, which included monies representing her salary as the chief executive officer and president of Company-2, into the bank accounts for the O'Quinn Family Trust at Bank of America.

**C.  Company-3**

17.     From at least 2010 to 2020, Robert Rubin served as Vice-President of Business Development for Company-1. From January 2020 to December 2022, Robert Rubin served as the Vice-President of Business Development and a Managing Director for Company-1's parent corporation.

18.     Robert Rubin owned Cyrus Strategies, a consulting firm based in Bethesda, Maryland. Cyrus Strategies received payments from Company-3 and Company-4.

19.     Company-3 was a Maryland corporation engaged in the business of providing protective security officers at federal workplaces.

20.     Individual 5, Robert Rubin's sister-in-law, was the founder, incorporator, and an initial director of Company-3. From its incorporation to the present, Individual 5 served as Company-3's chief executive officer and president.

4

21.    MCKHU received payments for defendant LESLIE KACIBAN and his family members from Company-3.

22.    Later, Individual-3 and Individual-4 incorporated Superior Professional Solutions, LLC. Superior Professional Solutions, LLC was used as a vehicle for defendant LESLIE KACIBAN and his family members to receive payments from Company-3.

### D. Company-4

23.    From January 2008 to October 2023, Individual-6 served as Company-1's Vice-President of Operations. In 2016, Individual-6 agreed with defendant LESLIE KACIBAN to form a corporation which would act as a subcontractor to Company-1 but would appear to be a woman-owned or disabled veteran-owned business. In June 2016, Individual 6 formed Company-4 with his wife as its owner, director, and president.

## Count One

### Conspiracy
### (18 U.S.C. § 371, 29 U.S.C. § 186)

24.     The allegations contained in paragraphs 1 through 23 are realleged in this Count and are incorporated by reference as if fully set forth herein.

25.     Beginning at least as early as February 2010, and continuing at least through June 2024, both dates being approximate, in the Eastern District of Virginia and elsewhere, defendant,

**LESLIE KACIBAN,**

did willfully, and knowingly, combine, conspire, confederate, and agree together with persons both known and unknown to the Grand Jury, as an agent of Company-1, to unlawfully and willfully pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value exceeding $1,000 in value to Ricky O'Quinn as an officer or employee of SPFPA, a labor organization, which represented, sought to represent, or would admit to membership, the employees of Company-1 and Company-2, in violation of Title 29, United States Code, Sections 186(a)(2), (b)(1), and (d)(2).

### Object of the Conspiracy

26.     It was an object of the conspiracy that defendant LESLIE KACIBAN, a person acting in the interest of Company-1, would unlawfully and willfully pay, lend, and deliver money and other things of value in excess of $1,000 to Ricky O'Quinn, an officer and employee in SPFPA which represented, sought to represent, and would admit to membership the employees of Company-1.

### Manner and Means of the Conspiracy

The manner and means by which Defendant LESLIE KACIBAN and his coconspirators sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

6

27.    Defendant LESLIE KACIBAN and his coconspirators and others known and unknown to the Grand Jury, agreed that Ricky O'Quinn would receive profits from government contracts that were fulfilled, in part, by SPFPA-represented guards, even though Ricky O'Quinn was an officer and employee of SPFPA.

28.    It was part of the conspiracy that Ricky O'Quinn would secretly participate in the operation of Company-2's business including its formation, finances, budget, selection of vendors, negotiation of contracts, and labor relations policies.

29.    It was further part of the conspiracy that defendant LESLIE KACIBAN and his coconspirators and others known and unknown to the Grand Jury, would conceal and attempt to conceal Ricky O'Quinn's involvement and operation of Company-2.

30.    It was a part of the conspiracy that that Ricky O'Quinn, Mabel O'Quinn, and others known and unknown to the Grand Jury, would unlawfully and willfully request, demand, receive and accept, and agree to receive and accept, and that defendant LESLIE KACIBAN would unlawfully and willfully pay, lend, and deliver, the payment, loan, and delivery of money and other things of value in excess of $1,000.00 from Company-1, to wit:

1)    the award of subcontracts from Company-1 to Company-2 to provide security guards at federal workplaces; and

2)    approximately $7,700,000 in proceeds stemming from subcontracts from Company-1 to Company-2 to provide security guards at federal workplaces.

### Overt Acts

In furtherance of the conspiracy and to accomplish its objects and purposes, at least one of the coconspirators committed and caused to be committed, in the Eastern District of Virginia and elsewhere, at least one of the following overt acts, among others:

7

31.    In or about February 2010, Mabel O'Quinn and one of defendant LESLIE KACIBAN's family members incorporated Company-2 with each to serve as Company-2's initial directors.

32.    On or about January 22, 2014, Ricky O'Quinn provided Defendant LESLIE KACIBAN with a sample invoice from Company-2 to Company-1 and asked him if it looked appropriate.  Defendant LESLIE KACIBAN approved the invoice and told Ricky O'Quinn to send it to him.

33.    On or about April 2014, defendant LESLIE KACIBAN, on behalf of Company-1, and Mabel O'Quinn, on behalf of Company-2, executed a subcontract whereby Company-2 would supply protective security officers for Company-1 as the prime contractor with United States Department of Homeland Services, Federal Protective Service at federal workplaces in Northern Florida.

34.    On or about January 31, 2016, Ricky O'Quinn emailed Company-2's year-to-date financial records for 2015 to defendant LESLIE KACIBAN who responded, "So let's look at it and talk."

35.    On or about August 2017, defendant LESLIE KACIBAN, on behalf of Company-1, and Mabel O'Quinn, on behalf of Company-2, executed a subcontract whereby Company-2 would supply protective security officers for Company-1 as the prime contractor with United States Department of Homeland Services at federal workplaces in Northern Virginia.

36.    On or about October 2019, defendant LESLIE KACIBAN, on behalf of Company-1, and Mabel O'Quinn, on behalf of Company-2, executed a subcontract whereby Company-2 would supply protective security officers for Company-1 as the prime contractor with United States Department of Homeland Services at federal workplaces in Louisiana.

37.     On or about October 2021, defendant LESLIE KACIBAN, on behalf of Company-1, and Mabel O'Quinn, on behalf of Company-2, executed a subcontract whereby Company-2 would supply protective security officers for Company-1 as the prime contractor with the United States Department of Homeland Services at federal workplaces in New England.

38.     On or about February 23, 2023, Mabel O'Quinn transferred or caused the transfer of approximately $12,331.19 to the O'Quinn Family Trust, which included monies representing her salary as the chief executive officer and president of Company-2, into the bank accounts for the O'Quinn Family Trust at Bank of America.

All in violation of Title 18, United States Code, Section 371.

## Count Two

### Conspiracy
### (18 U.S.C. § 371, 41 U.S.C. § 8702)

39.     The allegations contained in paragraphs 1 through 38 are realleged in this Count and are incorporated by reference as if fully set forth herein.

40.     Beginning at least as early as April 2013, and continuing at least through June 2024, both dates being approximate, in the Eastern District of Virginia and elsewhere, defendant,

### LESLIE KACIBAN,

did willfully, and knowingly, combine, conspire, confederate, and agree together with persons both known and unknown to the United States Attorney, to solicit, accept, or attempt to accept, specifically, money, fees, commissions, credits, gifts, gratuities, things of value and compensation from subcontractors and subcontractor employees, to improperly reward and obtain favorable treatment in connection with the award of security services contracts and subcontracts, in violation of Title 41, United States Code, Section 8702(1) and (2).

### Object of the Conspiracy

41.     It was an object of the conspiracy that Company-2, Company-3, and Company-4 would unlawfully and willfully provide, attempt to provide, or offer to provide kickbacks to defendant LESLIE KACIBAN, who was President of Company-1, and Individual-3 and Individual-4, who were, employees of Company-1, to improperly obtain and reward favorable treatment from Company-1 in connection with prime contracts, and subcontracts relating to prime contracts, for the provision of security guards at federal installations.

42.     It was an object of the conspiracy that defendant LESLIE KACIBAN, and Individual-3 and Individual-4, would unlawfully and willfully solicit, accept, or attempt to accept kickbacks from Company-2, Company-3, and Company-4 to improperly obtain and reward

10

favorable treatment from Company-1 in connection with prime contracts and subcontracts, with the federal government for the provision of security guards at federal installations.

### Manner and Means of the Conspiracy

The manner and means by which Defendant LESLIE KACIBAN and his coconspirators sought to accomplish the objects and purpose of the conspiracy included, among other things, the following:

43.    Ricky O'Quinn, Mabel O'Quinn, Individual-5, and Individual-6 would make kickback payments to improperly reward defendant LESLIE KACIBAN and Robert Rubin for favorable treatment by Company-1 in awarding subcontracts to Company-2, Company-3, and Company-4.

44.    It was a part of the conspiracy that defendant LESLIE KACIBAN, Individual-3, and Individual-4 would receive payments as an improper reward to defendant LESLIE KACIBAN and Robert Rubin for favorable treatment by Company-1 in awarding contracts to Company-2, Company-3, and Company-4.

45.    It was part of the conspiracy that Company-2 would also win prime contracts at times. When that occurred, Company-2 would use Company-1 as its subcontractor. In the performance of those prime contracts, Company-2 would transfer monies back to defendant LESLIE KACIBAN and his family members through MCKHU.

46.    It was a part of the conspiracy that Ricky O'Quinn and Mabel O'Quinn would form Company-2 with Mabel O'Quinn as the ostensible owner in order for Company-1 to take advantage of bidding preferences on federal contracts for provision of protective security officers for woman-owned and veteran-owned firms.

47.    It was a part of the conspiracy that Defendant LESLIE KACIBAN, Ricky O'Quinn, Mabel O'Quinn, Individual-3 and Individual-4 would present Mabel O'Quinn as the sole owner of Company-2 in order for Company-1 to compete for federal contracts to provide protective security guards it could not be able to legitimately bid upon, and compete for those contracts on the same terms, had it been known that Mabel O'Quinn was not the sole owner of Company-2.

48.    In or about February 2010, Defendant LESLIE KACIBAN and Ricky and Mabel O'Quinn had an unwritten agreement that Defendant LESLIE KACIBAN and his family members would receive 40 percent of the profits of Company-2 in exchange for favorable treatment for contracts from Company-1.

49.    Beginning at least as early as April 2013, and continuing at least through June 2023, Defendant LESLIE KACIBAN, acting on behalf of Company-1, agreed to award lucrative subcontracts to Company-2 to supply protective security officers at various federal installations in the United States to Company-2.  Defendant LESLIE KACIBAN did this knowing that Ricky O'Quinn was an officer and employee of SPFPA which represented the employees of Company-1 and that Ricky O'Quinn was married to Mabel O'Quinn.  Ricky O'Quinn and Mabel O'Quinn agreed to accept those subcontracts, and their proceeds, on behalf of Company-2.

50.    In January 2015, Defendant LESLIE KACIBAN and Individual-2 incorporated MCKHU.  Defendant LESLIE KACIBAN's two sons, Individual-3 and Individual-4, would thereafter operate a consulting business under the name, MCKHU even though they were full-time employees of Company-1.

51.    On April 1, 2015, Individual-2 on behalf of MCKHU and Mabel O'Quinn on behalf of Company-2 executed a consultancy agreement where Company-2 would pay MCKHU $195 per hour for various administrative services.  Despite the agreement that MCKHU would receive

payments on a per hour basis, MCKHU in fact, received payments exceeding $1.5 million in proceeds of the unwritten agreement to provide 40 percent of the equity and profits of Company-2 to the family of Defendant LES KACIBAN.

52.    On January 1, 2019, Mabel O'Quinn, on behalf of Company-2, signed an agreement with a company called Frontline Source for consultancy services at a rate of $225.00 per hour.  In August 2019, Individual-3 and Individual-4 incorporated Frontline Source as a vehicle for defendant LESLIE KACIBAN's family members to continue to receive payments from Company-2 according to the unwritten agreement to provide them with 40 percent of the equity and profits of Company-2.

53.    Individual-3 and Individual-4 submitted invoices to Company-2 that directed payments to be issued to Frontline Source. These invoices purported to bill Company-2 on a per hour basis. These invoices inflated the hours that Individual-3 and Individual-4 worked for Company-2.

54.    Frontline Source received payments exceeding $607,000. The payments that Frontline Source received were based on the unwritten agreement to provide 40 percent of the equity and profits of Company-2 to defendant LESLIE KACIBAN and his family.

55.    On or about December 6, 2021, defendant LESLIE KACIBAN and his sons informed Mabel O'Quinn that they believed they were owed an additional $800,000 in "equity payments" from beyond what Individual-3 and Individual-4 had received through MCKHU, Inc. and Frontline Source.

56.    Defendant LESLIE KACIBAN received a portion of monies that Company-2 paid to MCKHU and Frontline.

*Company-3*

57.    When Company-3 was formed in 2014, Defendant LESLIE KACIBAN directed that the ownership on paper was divided between Individual-5 at 51 percent, Cyrus Strategies (Robert Rubin) at 24.5 percent, and MCKHU (Individual-3, Individual-4, and defendant LESLIE KACIBAN) at 24.5 percent.

58.    Beginning at least as early as 2014, and continuing at least through June 1, 2023, defendant LESLIE KACIBAN, acting on behalf of Company-1, agreed to award lucrative subcontracts to Company-3 to supply protective security officers at various federal installations. Defendant LESLIE KACIBAN did this knowing that Cyrus Strategies and MCKHU were owners of Company-3.

59.    It was a part of the conspiracy that defendant LESLIE KACIBAN, Robert Rubin, Individual-3 and Individual-4 would attempt to conceal the involvement of Robert Rubin, Individual-3 and Individual-4 in the operation of Company-3.

60.    LESLIE KACIBAN, Robert Rubin, Individual-3 and Individual-4 would present Individual-5 as the majority owner of Company-3 in order for Company-1 to compete for federal contracts to provide protective security guards it could not be able to legitimately bid upon, and compete for those contracts on the same terms, had it been known that Individual-5 was not the majority owner of Company-3.

61.    LESLIE KACIBAN, Robert Rubin, Individual-3 and Individual-4 would agree that Cyrus Strategies would own 24.5 percent of the and that MCKHU would receive 24.5 percent of the profits of Company-3 in order to improperly reward defendant LES KACIBAN and Robert Rubin for favorable treatment by Company-1 in awarding contracts to Company-3.

62.    In December 2015, defendant LESLIE KACIBAN directed that Cyrus Strategies and MCKHU assist in Company-3's operation pursuant to consulting agreements providing for a $7,500 per month retainer and $225 per hour fee for hours in addition to the retainer, but which the parties never observed.

63.    Instead, Defendant LESLIE KACIBAN, Robert Rubin, Individual-3, and Individual-4 abided by the unwritten agreement that Individual-5, Cyrus Strategies, and MCKHU would each receive one-third of the proceeds from Company-3.  Each would receive a monthly payment from Company-3 depending on its cash on hand, as well as a year-end payment based on Company-3's cash on hand.  Those payments could range from $0 to more than $50,000 at the discretion of defendant LESLIE KACIBAN, Robert Rubin, Individual-3, and Individual-4.

*Company-4*

64.    It was a part of the conspiracy that Defendant LES KACIBAN, Robert Rubin, Individual-1, Individual-2, and Individual-6 would present Individual-6's wife as the majority owner of Company-4 in order for Company-1 to compete for federal contracts to provide protective security guards it could not be able to legitimately bid upon, and compete for those contracts on the same terms, had it been known that Individual-6's wife was not the majority owner of Company-4.

65.    From the inception of Company-4, defendant LESLIE KACIBAN had an unwritten agreement with the parties below that, despite the straw ownership of Individual-6's wife, the equity and profits of Company-4 would be divided as follows: 40 percent for Individual-6 and his wife; 40 percent for defendant LESLIE KACIBAN, Individual-3, and Individual-4; and 20 percent for Robert Rubin.

66.     Beginning at least as early as 2016, and continuing at least through June 1, 2023, defendant LESLIE KACIBAN, acting on behalf of Company-1, agreed to award lucrative subcontracts to supply private security guards at various federal installations in the United States to Company-4. Defendant LESLIE KACIBAN made those awards knowing that Individual-6 was an officer and employee of Company-1. Individual-6 agreed to accept those contracts, and their proceeds, on behalf of Company-4.

67.     It was a part of the conspiracy that Defendant LESLIE KACIBAN, Robert Rubin, Individual-3, Individual-4, and Individual-5 would agree that Defendant LESLIE KACIBAN, Individual-3, and Individual-4 would receive 40 percent of the equity and profits of Company-4; and Robert Rubin would receive 20 percent of the equity and profits of Cmpany-4 in order for Defendant LES KACIBAN, Robert Rubin, Individual-3, Individual-4, and Individual-6 to receive payments from the proceeds of federal government contracts with Company-1 to provide private security officers at federal installations as an improper reward to defendant LESLIE KACIBAN and Robert Rubin for favorable treatment by Company-1 in awarding subcontracts to Company-4.

68.     It was a part of the conspiracy that defendant LESLIE KACIBAN, Individual-3, and Individual-4 would form and operate MCKHU, Frontline Source, Superior Professional Solutions, LLC, and other companies, as vehicles to secretly direct proceeds of prime contracts and subcontracts for the provision of protective security guards from Company-2, Company-3, and Company-4 to themselves as an improper reward to defendant LES KACIBAN for favorable treatment by Company-1 in awarding subcontracts to Company-2, Company-3, and Company-4.

69.     It was a part of the conspiracy that defendant LESLIE KACIBAN, Individual-3, and Individual-4 would present false invoices from MCKHU, Frontline Source, and Superior

Professional Solutions, LLC to Company-2, Company-3, and Company-4 in order for them to secretly receive payments from these companies as an improper reward to Defendant LESLIE KACIBAN for favorable treatment by Company-1 in awarding subcontracts to Company-2, Company-3, and Company-4.

70.    It was a part of the conspiracy that Robert Rubin would operate Cyrus Strategies as a vehicle to secretly receive payments from Company-3 and Company-4.

71.    In exchange for the monthly payments from Company-3 to MCKHU, and his sons' hidden interest in Company-3, defendant LESLIE KACIBAN directed lucrative contracts on behalf of Company-1 to Company-3. Defendant LESLIE KACIBAN's secret intercession on behalf of Company-3 resulted in Company-3 being awarded millions in contract proceeds as a subcontractor to Company-1. The payment of a percentage of Company-3's profits to Defendant LESLIE KACIBAN and his family was, in part, for the purpose of improperly obtaining and rewarding favorable treatment from Company-1 and Defendant LESLIE KACIBAN in connection with the awarding of subcontracts from Company-1.

### Overt Acts

In furtherance of the conspiracy and to effect the objects and purposes thereof, the following overt acts, among others, were committed and caused to be committed by the defendants, and others, in the Eastern District of Virginia and elsewhere:

72.    On or about August 2017, Defendant LESLIE KACIBAN, on behalf of Company-1, and Mabel O'Quinn, on behalf of Company-2, executed a subcontract whereby Company-2 would supply protective security officers for Company-1 as the prime contractor with United States Department of Homeland Services, Federal Protective Service at federal workplaces in throughout Virginia, including within the Eastern District of Virginia.

17

73.     On or about December 5, 2018, Company-2 transferred or caused to be transferred approximately $200,000 to MCKHU.

74.     On or about December 26, 2018, Company-3 transferred or caused to be transferred approximately $148,965 to MCKHU.

75.     On or about January 1, 2019, Defendant LESLIE KACIBAN, on behalf of Company-1, and Individual-6's wife, on behalf of Company-4, executed a five-year subcontract whereby Company-4 would supply protective security officers for Company-1 as the prime contractor with United States Department of Homeland Security, Federal Protective Service at federal workplaces in Illinois.

76.     On or about April 5, 2019, Company-2 transferred or caused to be transferred approximately $361,345 to MCKHU.

77.     On or about April 19, 2019, Company-3 transferred or caused to be transferred approximately $10,000 to MCKHU.

78.     On or about October 1, 2019, Defendant LESLIE KACIBAN on behalf of Company-1, and Individual 5, on behalf of Company-3, executed a five-year subcontract whereby Company-3 as subcontractor would supply protective security officers for Company-1 as the prime contractor with United States Department of Homeland Security, Federal Protective Service at federal workplaces in Southern Virginia.

79.     On or about August 19, 2020, Company-2 mailed a check for Frontline Source for approximately $198,618.75. The mailing traveled from Florida to Herndon, Virginia, which was within the Eastern District of Virginia.

80.     On or about October 2021, Defendant LESLIE KACIBAN, on behalf of Company-1, and Mabel O'Quinn, on behalf of Company-2, executed a subcontract whereby Company-2

18

would supply protective security officers for Company-1 as the prime contractor with the United States Department of Homeland Services at federal workplaces in New England.

81.     On or about December 6, 2021, one of defendant LESLIE KACIBAN's family members informed Mabel O'Quinn the Kaciban family believed they were owned an additional $800,000 in "equity payments" from beyond what Individual-3 and Indiviudal-4 had received through MCKHU and Frontline Source.

(All in violation of Title 18, United States Code, Section 371.)

## Count Three

### Unlawful Kickbacks
### (41 U.S.C. § 8702(2))

82.    Paragraphs 1 through 81 of this Information are realleged and incorporated by reference here.

83.    On or about April 3, 2021, in the Eastern District of Virginia and elsewhere, the Defendant, LESLIE KACIBAN knowingly and willfully solicited, accepted, and attempted to accept a kickback, that is money, fees, commissions, credits, gifts, gratuities, things of value, and compensation provided, directly and indirectly, to defendant LESLIE KACIBAN, as a prime contractor employee, from Ricky and Mabel O'Quinn and Company-2 for the purpose of improperly rewarding and obtaining favorable treatment in connection with the award of security services contracts and subcontracts from Company-1.

(All in violation of Title 41, United States Code, Sections 8702(2), 8707).

## Count Four

**Unlawful Labor Payments**
**(29 U.S.C. § 186(a)(2), (b)(1) and (d)(2))**

84.    Paragraphs 1 through 83 of this Information are realleged and incorporated by reference here.

85.    In or around October 2021, in the Eastern District of Virginia and elsewhere, the Defendant, LESLIE KACIBAN, being a person who acts in the interest of an employer, that is the President of Company-1, did unlawfully and willfully pay lend, and deliver and agree to pay, lend, and deliver a thing of value and money exceeding $1,000.00 in value to Ricky O'Quinn, an officer of a labor organization, that is SPFPA, which representative and sought to represent and would have admitted to membership the employees of such employer who were employed in an industry affecting commerce, that is the private security industry.

(All in violation of Title 29, United States Code, Section 186(a)(2), (b)(1), and (d)(2)).

## **FORFEITURE NOTICE**

THE GRAND JURY FURTHER FINDS PROBABLE CAUSE THAT:

Pursuant to Fed. R. Crim. P. 32.2(a), defendant LESLIE KACIBAN is hereby notified that if convicted of any of the offenses set forth in Counts One, Two, and Four of this Indictment, Defendant LESLIE KACIBAN shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses of conviction.

The property to be forfeited includes, but is not limited to, a monetary judgment in the amount of at least $186,000, representing the proceeds the defendant obtained as a result of the violations described in this Indictment.

If any of the property described above, as a result of any act or omission of Defendant LESLIE KACIBAN:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

22

All pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

A TRUE BILL

Pursuant to the E-Government Act,
The original of this page has been filed
under seal in the Clerk's Office

Foreperson

Lindsey Halligan
United States Attorney and Special Attorney

Todd W. Blanche
Deputy Attorney General

Drew Bradylyons
Kathleen Robeson
Assistant United States Attorneys

David L. Jaffe
Department of Justice
Violent Crime and Racketeering Section
Chief

Vincent Falvo
Vincent J. Falvo, Jr.,
United States Department of Justice
Trial Attorney

23